**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| L.S. as mother and natural guardian | : | No. 3:22cv234 |
| of D.S., a minor, | : | |
| **Plaintiff** | : | (Judge Munley) |
| | : | |
| **v.** | : | |
| | : | |
| HANOVER AREA SCHOOL DISTRICT; | : | |
| NATHAN BARRETT; DAPHNE PUGH; | : | |
| JESSICA RAMAGLI; and MARY | : | |
| FARRELL, | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## <u>MEMORANDUM</u>

Before the court is a motion for summary judgment filed by Defendants Hanover Area School District, Nathan Barrett, Daphne Pugh, Jessica Ramagli, and Mary Farrell.  Having reviewed the discovery record, including deposition testimony and documentary evidence, the court finds that there are genuine issues of material fact that cannot be resolved without weighing evidence and assessing witness credibility.  Many of the claims asserted in this matter will proceed to trial, particularly the claims against Defendants Hanover Area, Ramagli, and Farrell.  However, after revisiting all of defendants' arguments in light of the summary judgment record, the civil rights claims against Defendants Barrett and Pugh will be dismissed based upon the principles of qualified immunity.  Summary judgment is also warranted in favor of Hanover Area on the

failure to train claim.  Therefore, defendants' motion for summary judgment will be granted in part and denied in part for the reasons set forth below.

**Background**

This matter arises from an alleged sexual assault of a three-year-old girl, D.S., on the playground of an elementary school on November 22, 2021.  The alleged assault occurred during a teacher-supervised recess period at the end of the school day.  The alleged perpetrators were male prekindergarten students. D.S.'s mother, L.S., is insistent that a sexual assault occurred.

Defendants did not consider the matter to be sexual assault based on the circumstances.  According to L.S.'s testimony in this matter, however, she was the only adult eyewitness to the above events as they unfolded, or at least the only adult eyewitness with an unobstructed view.  Based on L.S.'s account, the two students tackled D.S. to the ground, pinned her down, separated her buttocks, and shoved mulch into her body.  Furthermore, although L.S. has evidence that she reported the incident as a sexual assault early and often, it is undisputed that Hanover Area staff and administration did not initiate any of the Title IX protocols set forth in its formally adopted policies.

Defendants believe the post-incident remedies offered to the family were sufficient under the circumstances.  But whether remedial efforts were sufficient or insufficient relates back to a determination about what exactly occurred on the

2

playground.  By all accounts, Hanover Area administrators did not offer an opportunity for D.S. to return to the prekindergarten program unless she shared a class with at least one of the male students present.  As a result, D.S. did not return to Hanover Area schools until she was of kindergarten age.

L.S.'s initial pleadings set forth her lurid narrative of events, asserting that the defendants are liable for violation of Title IX of the Education Amendments of 1972, ("Title IX"), 42 U.S.C. § 1983 ("Section 1983"), and for negligence. Defendants previously challenged L.S.'s narrative and legal theories through a comprehensive motion to dismiss.  Plaintiff matched that motion with a detailed response in opposition.  Upon review, the court determined that most of the claims asserted by L.S. were plausible under a Rule 12(b)(6) standard.  L.S. v. Hanover Area Sch. Dist., No. 3:22CV234, 2024 WL 2393038 (M.D. Pa. May 23, 2024).

Because the court has already resolved the legal sufficiency of plaintiff's claims at the pleading state, the inquiry now shifts to the evidentiary record.  At the summary judgment stage, the narrative advanced by L.S.'s allegations has been replaced with her deposition testimony.  L.S.'s account creates genuine disputes of material fact regarding the events on the playground and how administrators responded to her reports of sexual assault thereafter—more than enough for this case to survive the defendants' motion for summary judgment.

3

### 1. The Incident on the Playground

As the summary judgment record stands, the Lyndwood Learning Center is a public elementary school in Hanover Township, Luzerne County, Pennsylvania.[1] (Doc. 70-27, SOF ¶¶ 2, 9).  D.S. attended the district's PreK Counts program at the school.  Id. ¶ 9.  At the time of the events discussed in this memorandum, D.S. was approximately two weeks away from her fourth birthday. (Doc. 74-16, L.S. Dep. 13:10-15).

The incident at issue occurred just prior to Hanover Area's Thanksgiving break.  On Monday, November 22, 2021, L.S. arrived at the school prior to dismissal as she did most days. (SOF ¶ 10; L.S. Dep. 184:23–186:10).  She watched D.S. play on Lyndwood's playground with her prekindergarten classmates.[2]  Id.  L.S. stood outside her vehicle on the sidewalk of an adjacent street. (L.S. Dep., 48:14-22, 104:14–105:2).  From L.S.'s vantage point, she could see one side of a play structure, which she described as having two slides facing in her direction.  Id., 86:25–90:19.

---

[1] When possible, the court references defendants' statement of material facts ("SOF"), (Doc. 70-27), for facts that are not disputed in plaintiff's response to that statement ("RSOF"), (Doc. 74).  Otherwise, this memorandum cites to portions of the summary judgment record supplied by the parties.  At the summary judgment stage, all facts from the record are construed in a light most favorable to the plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015) (citation omitted).  Consequently, this background section construes the record in L.S.'s favor.

[2] The family lived within walking distance of the school. (L.S. Dep. 179:14–180:13).  L.S. testified that she enjoyed watching D.S. play and run around at recess.  Id.

Four adults were monitoring the fenced-in playground, including Defendants Jessica Ramagli and Mary Farrell, two prekindergarten teachers at the Lyndwood school. (SOF ¶¶ 5–6; L.S. Dep. 194:25–24)  They were joined by teacher's aides, Alicia Schlauch[3] and Cassandra Williams.[4]  (SOF ¶ 7; L.S. Dep. 194:25–24).  Defendant Ramagli was D.S.'s prekindergarten teacher. (L.S. Dep. 330:3-9).

The supervision on the playground that day is a point of significant contention in this case. Id., 186:12-23.  According to L.S., Williams was standing on one side of the play structure near the portion of perimeter fence closest to the school.  Id., 195:17-20.  As for Ramagli, Farrell, and Schlauch, L.S. testified that they were standing together with their phones out on the other side of the structure. Id., 186:24–189:7, 194:25–195:24.  According to L.S., this failure to supervise caused D.S. to be sexually assaulted.

---

[3] Schlauch was previously a defendant in this action.  She was dismissed with prejudice pursuant to a stipulation and order dated October 2, 2023. (Doc. 58).

[4] The testimony in this case demonstrates why a jury needs to weigh witness credibility and determine whether other considerations played a role in any of the events at issue in this case. For example, L.S. testified that she had complained to Defendant Pugh about Schlauch and Williams leaving the playground during recess to take cigarette breaks behind Williams's house across the street. (Doc. 74-16, 145:15–146:14, 190:3–193:18).  L.S. also appears to have suggested that Williams was drinking alcohol on the job in her complaints. Id.  From L.S.'s testimony, such complaints may have occurred just days before the playground incident involving D.S. Id.

L.S. recounted what she witnessed that afternoon from across the street. As she waited for school to be dismissed, L.S. observed her daughter playing with two male classmates. Id., 80:16–81:10.  L.S. saw one of the male students shove D.S. to the ground. Id., 81:16–82:9.   D.S. fell onto her back and started to kick at the male students, who were trying to grab her legs. Id.

D.S. got up and began running. Id., 82:10–83:1.  D.S. then ran around the playground structure and up a slide. Id.  The male students tried to pull her pants down as they chased her up the slide. Id., 80:16–81:10, 84:4–85:1.  L.S. indicated that D.S.'s pants "started coming down" as she was running up the slide, exposing her underwear.  Id., 82:10–83:1;  83:12-22.  D.S. made it to the top of the slide, pulled up her pants, and went down a different slide. Id.

 D.S. then ran around the equipment again back to the area where she had just climbed the slide. Id., 82:20–83:1.  One of the male students tackled D.S. to the ground in between the area of the two slides.  According to L.S., D.S. landed face down in the wood chips or mulch placed around the play structure. Id.

L.S. indicated that both male students climbed onto D.S. as she laid on the ground. Id., 91:3-10.  One student held D.S. down and pushed her face into the mulch. Id. 79:11-16, 227:11–228:15.  The other student pulled down D.S.'s pants and underwear. Id. 228:12–229:13.  According to L.S., this other male student used his hands to separate D.S.'s buttocks and shove mulch inside D.S.'s body.

6

Id. 61:11-22; 228:12–229:13.  By L.S.'s account, D.S. yelled for her friend and then screamed for help. Id. 231:25–232:5.

As D.S. was being tackled to the ground by the male students, L.S. began running toward the playground gate from across the street according to her testimony.  (SOF ¶ 14, L.S. Dep. 38:14–40:8, 76:1-21, 105:6–106:14, 227:21–227:25).  L.S. further indicated that she was screaming to get the attention of school staff. Id., 231:18–233:3, 326:15–327:11.  Defendants Ramagli and Farrell testified that they heard L.S. screaming and yelling. (Doc. 74-15, Farrell Dep. 39:15-20; 41:14-24; Doc. 74-18, Ramagli Dep. 41:11-14).

According to L.S., however, Defendants Ramagli and Farrell were standing with Schlauch, a teacher's aide, on the other side of the playground structure and failed to react. (L.S. Dep. 186:12–189:7, 195:9-20, 210:2-21, 327:14–12).  By L.S.'s account, the other teacher's aide on the playground, Williams, was the school employee with the most direct path to the area where D.S. had been tackled. Id., 188:18–189:7.  After being alerted by L.S. screaming, Williams went over to the children and pulled the male students off D.S.  Id., 76:1-21, 143:15–144:7.  Per L.S.'s testimony, Williams helped D.S. up from the ground and wiped mulch off her buttocks. Id.  Williams also pulled up D.S.'s underwear and pants and gave D.S. a hug. Id.  D.S. ran toward her mother crying. Id., 206:10–207:9.

L.S. further testified that Williams looked at Defendants Farrell and Ramagli and said, "oh, my God, these boys are just trying to put mulch in her butt." Id., 76:9-76:21. By L.S.'s account, she told staff that D.S. was sexually assaulted in response to their questions about what happened. Id., 139:25–140:8. According to L.S.'s testimony, Farrell stated that they would need to make a report. Id., 139:25–140:8, 211:17–212:4, 235:1-9. As further recounted by the plaintiff, Ramagli tearfully said, "I'm sorry that this happened to you." Id.

L.S. maintains that Defendants Ramagli and Farrell were not supervising D.S. and the male students; they were using their phones on the other side of the playground equipment. Id., 186:12–189:1, 194:25–195:16, 217:17–218:3, 323:8-20.

Some other witness testimony lines up with L.S.'s account of the events. For example, Defendant Farrell, a teacher, explained in her deposition that she *was* using her cell phone on the playground — to look for an email about a staff meeting later that day, to show Williams some of her family members' photos on Facebook, and to resume looking for the email about the staff meeting. (Doc. 74-15, 38:1–40:4, 72:5–78:5). Farrell testified that she "didn't see anything with the children." Id., 41:14-20. Rather, Farrell stated that she was walking toward Defendant Ramagli and talking about the staff meeting when she first witnessed L.S. yelling and running toward the playground. Id., 44:12-22, 45:15-23.

D.S's teacher, Defendant Ramagli, testified that she did not see the events unfold and only observed Williams picking D.S. up off the ground. (Doc. 74-18, 17:11–18:4, 21:9-21).  Ramagli testified that L.S. had run up to the gate of the playground and was screaming, "her rectum, they're in her rectum." Id., 17:11–18:4.  According to Ramagli, she continued to ask D.S. if she was ok after the incident because her mother, L.S., was screaming about "somebody…putting things in her rectum."[5] Id., 27:2-5.  Furthermore, per her testimony, Ramagli observed mulch on D.S.'s back and on her clothes. Id., 27:6-9.

Ramagli dismissed D.S. from school to L.S. after the incident.  L.S. then drove D.S. to a hospital emergency room for medical treatment. (L.S. Dep., 28:10-16).  According to L.S., there were abrasions in between D.S.'s buttocks and mulch inside her underwear. Id., 34:2–35:21.  L.S. did not observe any mulch in D.S.'s rectum at the time of the medical exam. Id.  D.S.'s medical records reflect that the child was evaluated for an assault. (Doc. 70-6).  Those same records indicate that there were "no external abrasions in the perianal region." Id.

---

[5] As another example of other considerations a jury must weigh, Defendant Ramagli taught L.S.'s son when he was in kindergarten a few years prior. (Doc. 74-18, Ramagli Dep., 35:9–36:11).  According to Ramagli's testimony, she had prior communications with L.S. after D.S.'s older brother "had hurt other students" and "had taken feces out of the toilet and [thrown] it at [a] bathroom door." Id.  Per Ramagli, the recommendations made to L.S. to address D.S.'s older brother's behavior did not work out at that time. Id.  This testimony was prompted by a question asking Ramagli if there had been any prior "problem" with L.S.

According to L.S., she then travelled to the Hanover Township Police Department building and explained the events to a patrol officer and a detective. (L.S. Dep., 54:14–57:22).  L.S. testified that the officers would not act due to the ages of the children involved.  Id.

L.S. later scheduled appointments for D.S. at the Victim's Resource Center. D.S. had at least 20 visits with counselors there at the time of the depositions in this case. Id., 148:4-20.  L.S. further testified that D.S. has endured nightmares and bed-wetting incidents since the events at the Lyndwood school playground. Id., 268:24–269:22, 310:3–311:13.  According to L.S., D.S. was afraid to go back to school, even approximately two years later at the time of her enrollment in kindergarten. Id.

## 2. The District's Responses to the Playground Incident

Although Ramagli testified that she did not witness the incident, she later completed separate school behavior incident reports indicating that the male students "pulled another student's pants down" and were "throwing mulch in his/her pants." (Docs. 74-5, 74-6, Pl. Exs. 8–9).

Williams, the teachers' aide who helped D.S., was not deposed in this matter.  She was not named as a defendant.  Williams, however, supplied a declaration in support of the defendants' motion for summary judgment indicating that "[t]he playground has climbing structures and slides and other obstacles that

impede full visibility of the entire playground from some vantage points." (Doc. 70-24, Def. Ex. T).  On the other hand, Williams did not specifically declare what she observed regarding D.S. and the male students prior to being alerted to the alleged assault by L.S. Id.

During the relevant period, Defendant Nathan Barrett served as Hanover Area superintendent (hereinafter "Superintendent Barrett"). (SOF ¶ 3). According to her email signature, Defendant Daphne Pugh's served as the district's "Director of Curriculum K-12, Director Title I/Federal & State Programs/PreK Counts/Virtual Academy" (hereinafter "Pre-K Director Pugh"). (Doc. 70-13, Def. Ex. I).  On the date of the incident, L.S. contacted Pre-K Director Pugh by telephone to discuss the incident on the playground. (SOF ¶ 24).  Pugh indicated that she would speak to Superintendent Barrett and get back to L.S. Id.

The post-incident record reveals a divide between L.S.'s reports and Hanover Area's administrative response.  According to an email produced in discovery from the date of the incident, Williams reported to Pre-K Director Pugh at 3:25 PM that she observed the boys and D.S. "on the ground" and that D.S.'s "bottom was out." (Doc. 70-9, Def. Ex. E).  As to the report of the incident from Williams, Pugh testified:

> Q. So you would characterize Cassandra Williams's
> report as nothing out of the ordinary?

11

A. That's how it was reported.

(Doc. 74-17, 21:21-23).

Nonetheless, Pre-K Director Pugh never obtained clarity from Williams as to whether "bottom was out" meant that D.S.'s underwear was also pulled down. Id. 22:3–24:12. Furthermore, Williams's declaration in support of summary judgment also did not supply that clarity, although it was signed approximately 18 months after Pugh's deposition.[6] (See Doc. 70-24, Def. Ex. T).

According to Ramagli, she completed the incident reports after she spoke to Pre-K Director Pugh. Pugh testified that Ramagli relayed that L.S. ran over to the playground and D.S.'s "pants were falling down and that…they had been playing with the mulch." (Doc. 74-17, 14:7-15). Pugh stated she provided this information to Superintendent Barrett. Id.

Defendant Ramagli emailed Pugh at 4:37 PM on the date of the incident, supplying statements from L.S. that "two boys had D.S.'s pants down and were putting mulch in her butt." (Doc. 70-10, Def. Ex. F). Pugh testified that she did not recall then reporting to Superintendent Barrett what L.S. was alleging. (Doc. 74-17, 16:16-19, 19:4-8).

---

[6] Specifically, Williams declared: "As I approached the three children, I saw that D.S.'s pants were slightly down, and her bottom was out. This did not cause me great concern at the time because D.S.'s pants were too big for her." (Doc. 70-24 ¶ 11).

12

During his deposition, Superintendent Barrett testified that he understood the incident — as relayed by Pre-K Director Pugh in a face-to-face meeting that day — to be "horseplay." (Doc. 74-14, N. Barrett Dep., 12:1-16, 31:19–32:3). In subsequent conversations with Pugh, he learned "there was actually mulch that was in the student's pants." Id., 14:23–15:1. According to Barrett, he was unaware that two boys knocked D.S. down and pulled down her pants and underwear until he read the federal court complaint. Id., 15:2-17. Barrett also stated he was unaware of L.S.'s allegations that mulch was placed inside D.S.'s buttocks until that time. Id. Nonetheless, the summary judgment record includes an email from L.S. to Barrett dated December 15, 2021. (Doc. 74-3). The record is clear that L.S. advised Barrett at that time that D.S. had been sexually assaulted on the playground. Id. Barrett testified that he conferred with Pre-K Director Pugh "and [they] didn't know where some of this stuff was coming from." (Doc. 74-14, N. Barrett Dep., 84:25–88:8). Barrett stated that he and Pugh concluded that there was no evidence of the playground incident being sexual in nature. Id.

Returning to the date of the incident, at 5:17 PM, Pre-K Director Pugh followed up on the earlier conversation with L.S. by text message. Pugh advised L.S. that the matter was discussed with Superintendent Barrett and that "disciplinary action" would be taken. (Doc. 70-18, Def. Ex. N). According to

Barrett, the actions ultimately taken were to put a "safety plan" in place and have "a teachable moment" where "social and emotional learning about hands and feet to [ourselves]" would be relayed. (Doc. 74-14, N. Barrett Dep., 56:14–57:21). The safety plan also involved assigning "coordinates" to school staff members on the playground. Id., 20:4-20, 57:2-22, 71:3-18, 76:5-22. From Barrett's testimony, the boys lost their recess privileges for a "couple days." Id., 65:12-24.

As for the efficacy of that safety plan, another parent, C.S., removed her daughter from Hanover Area's PreK Counts program in February 2022 because a male child would "not keep his hands off" her daughter and her daughter did not want to return to school. (Doc. 74-11, Pl. Ex. 31, C.S. Email to Superintendent Barrett). C.S. further accused Schlauch of being "far too consumed in her phone" to respond to her daughter's complaints of unwanted touching. Id.

According to the testimony in this case, C.S. contacted L.S. about this situation. (Doc. 74-16, L.S. Dep., 273:18–279:1). Per C.S.'s account to L.S., one of the male students involved in D.S.'s incident touched C.S.'s child on the hip. Id. According to Pre-K Director Pugh's testimony, C.S. was a school employee. (Doc. 74-17, 74:15–76:22).

D.S. did not attend school on November 23 or 24, 2021. (SOF ¶ 31). On Wednesday, November 24, 2021, L.S. texted Pre-K Director Pugh to inquire

14

whether D.S. would be in class with the two boys involved. (Doc. 70-18, Def. Ex.

N).  In that text message exchange, Pugh offered to move D.S. to Defendant

Farrell's classroom. Id.  L.S. did not agree. Rather, she replied:

> I would feel more comfortable if [D.S.] stayed in Mrs.
> Ramagli's room because she does love her teacher.  Is
> there a way to move the boys since [D.S.] wasn't the one
> who caused the problem?

Id.

Pre-K Director Pugh replied in the negative.  Pugh told L.S. that she only

had the ability to move one student into Defendant Farrell's classroom. Id.

Pugh's last text to L.S. stated: "Let me know if moving one works for you.  [D.S.]

can then stay with Ms. Ramagli." Id.

Hanover Area's schools were closed until December 6, 2021 for

Thanksgiving break and then for a post-holiday COVID-19 quarantine. (SOF ¶¶

45–46).  On December 6, 2021, the date school resumed in person, Pre-K

Director Pugh unilaterally moved one of the male students involved in the

incident from D.S's class to Defendant Farrell's class. (Doc. 74-7).

Although there were additional communications between L.S. and

Defendants Barrett and Pugh in December 2021, the parties' positions remained

the same.  L.S. requested that both boys be moved out of D.S.'s classroom.

Pre-K Director Pugh remained firm in not moving both students.

Superintendent Barrett concurred with Pugh's decisions.  Prior to Christmas break, Superintendent Barrett advised L.S. that her "absolute request" would not be accommodated.  (Doc. 70-7).  D.S. did not return to Hanover Area's PreK Counts program.[7]

### 3. Defendants' Renewed Legal Arguments

On February 17, 2022, L.S. filed a five-count complaint against the defendants, which she amended on September 7, 2022. (Docs. 1, 32).  In the operative amended complaint, L.S. asserts several claims on behalf of D.S. pursuant to Title IX, Section 1983, and state law.

Count One of plaintiff's amended complaint advances that Defendant Hanover Area was deliberately indifferent to a report of sexual assault or sexual harassment in violation of Title IX. (Doc. 32, Am. Compl. ¶¶ 43-49).  Count Two advances that Hanover Area retaliated against D.S. in violation of Title IX.[8]  Id. ¶¶ 50-53.

Count Three asserts negligence claims under state law against Defendants Hanover Area, Farrell, and Ramagli. Id. ¶¶ 54-59.

---

[7] Pugh had already moved one of the male students as of December 6, 2021, D.S.'s return to school continued to be conditioned on her sharing a classroom with one of the male students involved in the incident or being "traded" to Defendant Farrell's classroom for the male student that had just moved.  L.S. can point to evidence discrediting the defendants' decisions or explanations for these decisions in either scenario.

[8] The Title IX claims against Defendants Barrett and Pugh have been dismissed. (Doc. 61).

Count Four raises Section 1983 claims against Defendants Hanover Area, Barrett, and Pugh for allegedly violating D.S.'s equal protection rights under the Fourteenth Amendment. Id. ¶¶ 60-69. Count Five advances a separate Section 1983 claim asserting that Defendant Hanover Area failed to train its employees to prevent, recognize, and appropriately respond to sexual harassment and sexual assault in violation of D.S.'s due process and equal protection rights.[9] Id. ¶¶ 70-76. After a period of discovery, defendants filed a motion for summary judgment renewing the legal arguments raised in their motion to dismiss.

For the reasons that follow, the claims against Hanover Area, Ramagli, and Farrell in Counts One, Two, and Three will move forward. Partial summary judgment will be granted in Hanover Area's favor on Count Four regarding plaintiff's disparate treatment theory of liability. But the motion for summary judgment will be denied regarding the hostile educational environment claim asserted against Hanover Area in Count Four under Section 1983 for violation of the Equal Protection Clause. Additionally, summary judgment will be granted in favor of Superintendent Barrett and Pre-K Director Pugh on Count Four because they are immune from the Section 1983 claims advanced in this case. Summary

---

[9] To the extent that Count Five was premised on an alleged violation of plaintiff's substantive due process rights, that portion of the complaint has been dismissed. (Doc. 61).

judgment will also be granted in favor of Hanover Area with respect to the single-

incident failure-to-train claim advanced against the district in Count Five.

**Jurisdiction**

Based on the alleged violations of Title IX and Section 1983, this court has

jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). The court

also has supplemental jurisdiction over plaintiff's state law negligence claims

pursuant to 28 U.S.C. § 1367(a).

**Standard of Review**

Defendants have filed a motion for summary judgment.  Summary

judgment is proper when there is no genuine issue of material fact in the case

and the moving party is entitled to judgment as a matter of law.  Reedy v.

Evanson, 615 F.3d 197, 210 (3d Cir. 2010) (citation omitted); see also FED. R.

CIV. P. 56(a).  "A fact is material if its resolution 'might affect the outcome of the

suit under the governing law,'…[a]nd a dispute is genuine 'if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party.' " Mall

Chevrolet, Inc. v. Gen. Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

At this stage, the judge's function is not "to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine

issue for trial." Anderson, 477 U.S. at 249.  All "facts in dispute," Daniels, 776

F.3d at 187, and all "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the opposing party," <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (cleaned up). "[W]hen there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." <u>Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters & Joiners</u>, 676 F.2d 81, 84 (3d Cir. 1982). Furthermore, "a court's role remains circumscribed in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations." <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992) (citation omitted). "[W]here the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." <u>Id.</u> (citations omitted).

Summary judgment may also be granted where a moving party demonstrates that the nonmoving party "has not made 'a showing sufficient to establish the existence of an element essential to that party's case ... on which that party will bear the burden of proof at trial.' " <u>Mall Chevrolet, Inc.</u>, 99 F.4th at 630 (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 332 (1986) (emphasis removed)); <u>see also</u> FED. R. CIV. P. 56(c), (e)(3).

**Analysis**

In review of defendants' moving papers, they again assert, in so many words, that: 1) no sexual assault occurred; 2) the response to the incident was appropriate; 3) the individual defendants are immune; and 4) the school district cannot be held liable on these facts. The parties' briefs are again extensive, but based on the summary judgment record, the court's analysis need not be regarding the claims that will move forward to trial. On those claims in Counts One, Two, and Three, and for a portion of Count Four, L.S. has either produced evidence to support her legal claims or demonstrated that there are genuine issues of material fact to be resolved by a jury. As explained below, summary judgment is warranted in favor of defendants on most of the Section 1983 claims advanced in this case.

## 1. Plaintiff's Title IX Claims

The motion for summary judgment will be denied regarding the Title IX deliberate indifference claim and Title IX retaliation claim against Hanover Area.

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). More simply stated, Title IX "prohibits sex discrimination by any elementary or secondary school…that receives federal

financial assistance." <u>Bostock v. Clayton Cnty., Georgia</u>, 590 U.S. 644, 726

(2020) (Alito, J., dissenting).

Title IX implies a private right of action, which encompasses intentional sex

discrimination in the form of a federal fund recipient's deliberate indifference to

sexual harassment of a student by another student. <u>Jackson v. Birmingham Bd.</u>

<u>of Educ.</u>, 544 U.S. 167, 173 (2005) (citing <u>Davis Next Friend LaShonda D. v.</u>

<u>Monroe Cnty. Bd. of Ed.</u>, 526 U.S. 629, 642 (1999) ("<u>Davis</u>")). Retaliation claims

are also cognizable under Title IX because "[r]etaliation against a person

because that person has complained of sex discrimination is another form of

intentional sex discrimination encompassed by Title IX's private cause of action."

<u>Id.</u>

### a. Deliberate Indifference

To prevail on a Title IX deliberate indifference claim, L.S. must show that:

1) the defendant received federal funds; 2) sexual harassment occurred;

3) the defendant exercised substantial control over the harassers and the context

in which the harassment occurred; 4) the defendant had actual knowledge of the

harassment; 5) that defendant was deliberately indifferent to the harassment; and

6) the harassment was so severe, pervasive, and objectively offensive that it

deprived her daughter of her access to the educational opportunities or benefits

provided by the school. See Hall v. Millersville Univ., 22 F.4th 397, 408 (3d Cir. 2022).

With the motion for summary judgment, Hanover Area argues that L.S. has failed to demonstrate that sexual harassment occurred or that the school was deliberately indifferent. There is a high bar to establish liability for deliberate indifference under Title IX. Id. at 407. L.S. has responded to the motion for summary judgment with evidence to clear that bar.

*Sexual Harassment* – Hanover Area challenges L.S.'s position that a sexual assault occurred or even could occur given the ages of D.S. and the male students. If L.S. is believed by a jury, however, she has described a sexual assault as it is legally defined. See L.S., 2024 WL 2393038, at *5. Student-on-student sexual assault constitutes sexual harassment for the purposes of Title IX. Id.

*No Bright Line* – Hanover Area continues to reference the ages of D.S. and the male students, as if an age-based bright line exists in precedential Title IX case law. It does not. The court returns to the relevant portion of Davis:

> Whether gender-oriented conduct rises to the level of actionable "harassment" thus "depends on a constellation of surrounding circumstances, expectations, and relationships," Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), including, but not limited to, the ages of the harasser and the victim and the number of individuals involved, see OCR Title IX Guidelines 12041–12042.

Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. <u>See</u>, <u>e.g.</u>, Brief for National School Boards Association et al. as Amici Curiae 11 (describing "dizzying array of immature ... behaviors by students").

Indeed, at least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it.

Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

526 U.S. at 651–52 (formatting modified).

<u>Davis</u> makes clear that there are "very real limitations on a funding recipient's liability under Title IX." <u>Id.</u> at 652.  For example, it is not enough that a student has been teased or called offensive names even if it causes that child to refuse to attend school or causes a drop in their grades. <u>Id.</u>  In response to the dissenting opinion, <u>Davis</u> also contains skepticism that a single instance of peer-on-peer harassment would be serious enough to systemically deny a victim equal

access to education, but the majority did not explicitly draw a line based on age or require that there be more than one incident of harassment.  Id. at 652–53.

According to L.S.'s eyewitness testimony, this case involves more than teasing, shoving, or pushing.  Per L.S.'s "own two eyes," D.S. was tackled by two boys and anally penetrated by a foreign object.  Thus, at this posture, the court must treat the incident as severe, pervasive, and objectively offensive sexual harassment for the purposes of plaintiff's Title IX deliberate indifference claim against the district.  The parties present two irreconcilable versions of the facts, the resolution of which belongs to a jury.

The school district also asks the court to "acknowledge that the boys (ages 3 and 4) were presumptively biologically incapable of [sexual] impulse or desire." (Doc. 70-2, Def. Br. in Supp. at 13).   To that end, Hanover Area requests that the undersigned take judicial notice of those biological incapabilities. Id.  But clearly, the biological capabilities or incapabilities of prekindergarten-age boys are not facts that may be judicially noticed.[10]  Rather, these are matters requiring particularized knowledge, skill, experience, training or education, i.e., matters requiring expert testimony. See FED. R. EVID. 702.  To obtain summary judgment,

---

[10] Under the Federal Rules of Evidence, the court may only judicially notice a fact that is not subject to reasonable dispute because it: 1) "is generally known within the trial court's territorial jurisdiction;" or 2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201.

Hanover Area would have had to support this factual position with materials in the record such as unrebutted expert testimony. <u>See</u> FED. R. CIV. P. 56(c)(1)(A). Hanover Area did not procure an expert to provide such an opinion. Consequently, summary judgment will not be granted based upon the district's unsupported positions about child development.

<u>Deliberate Indifference</u> – Hanover Area also argues that the conduct of its staff and administrators did not evince deliberate indifference as required for a Title IX claim.  Under the law, Hanover Area's deliberate indifference "must cause the harassment or make the victim vulnerable to it" for the Title IX claim to survive summary judgment.  <u>McAvoy v. Dickinson Coll.</u>, 115 F.4th 220, 228 (3d Cir. 2024) (citing <u>Davis</u>, 526 U.S. at 644–45).[11]  "[D]eliberate indifference occurs

---

[11] In the accompanying footnote, the Third Circuit noted:

> Based on the Supreme Court's holding that liability may arise if a school has made a student vulnerable to harassment, some Courts of Appeals have held that students need not show that the school's deliberate indifference led to any additional post-notice incidents of harassment. <u>See, e.g.</u>, <u>Doe v. Fairfax Cnty. Sch. Bd.</u>, 1 F.4th 257, 274 (4th Cir. 2021). Other Courts of Appeals have held, in contrast, that post-notice incidents of harassment are required before liability for deliberate indifference may attach. <u>See, e.g.</u>, <u>Kollaritsch v. Mich. State Univ. Bd. of Trs.</u>, 944 F.3d 613, 622–23 (6th Cir. 2019). Our Court has not yet decided this issue and we need not do so in this case.

<u>McAvoy</u>, 115 F.4th at 228.  Based on defendants' responses to the playground incident, D.S. did not return to school.  Additionally,  L.S. has provided evidence that another female prekindergarten student was removed from the program by her mother, a school employee, for continued unwanted touching by one of the male students after the incident involving D.S.

only where the Title IX recipient's response 'is clearly unreasonable in light of the known circumstances.' " Id. (quoting Davis, 526 U.S. at 648).  To satisfy Title IX's express terms, Hanover Area "cannot be liable unless the harassment is extreme enough to deprive the victim of access to the educational opportunities or benefits that the Title IX recipient provides." Id. (quoting Davis, 526 U.S. at 650).

Whether Hanover Area's response to the incident meets the deliberate indifference standard is a question of fact. See id. (citing Hall, 22 F.4th at 410–11).  This question of fact cannot be resolved by the court on summary judgment. After a thorough review of the record, a jury's determination of what actually transpired on the playground governs whether the district responded reasonably and appropriately or with deliberate indifference.  For her part, L.S. has advanced evidence that, despite actual notice, no teacher or administrator believed her account that male students violently shoved playground mulch into D.S.'s rectum.

Viewing the evidence in the light most favorable to L.S. as the non-moving party, the district's response was to downplay the matter as less serious, non-sexual misconduct—"pushing and shoving and rough horseplay." (Doc. 76-14, N. Barrett Dep., 41:12–42:6).  Based on this view, D.S. would have remained in class with one of the male students who allegedly placed playground mulch inside her rectum.  D.S. would also have to return to the playground with both boys if she returned to school.  Id. 65:12–66:2.  Thus, a jury may reasonably

believe that D.S. was violated as described and that L.S.'s remedial requests were met at a district level with disbelief and disengagement under those circumstances.  Consequently, defendants' motion for summary judgment will be denied as to the Title IX deliberate indifference claim.

### b. Retaliation

To establish a *prima facie* case of retaliation in violation of Title IX, a plaintiff must show: (1) that she engaged in protected activity; (2) she suffered an adverse action; and (3) there was a causal connection between the two. <u>Doe v. Mercy Cath. Med. Ctr.</u>, 850 F.3d 545, 564 (3d Cir. 2017) (citing <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 340–42 (3d Cir. 2006)).  The district continues to argue that D.S. did not experience an adverse action.  As previously addressed:

> Assuming the facts of the complaint to be true, D.S. suffered materially adverse action based on the parties' reactions and responses to what took place on the playground: she was caused to stop attending prekindergarten.  On a motion to dismiss, the court can only consider the plaintiff's factual position. A reasonable parent in plaintiff's shoes would have been dissuaded from making a charge of sex-based discrimination on behalf of her child if it would cause her child to have to leave school based on school officials' conduct following the report.

<u>L.S.</u>, 2024 WL 2393038, at *10.

The evidentiary record has caught up to the pleadings in this case.  L.S. has provided evidence to rebut the one-sided view of the facts advanced in the

defendants' moving papers.  Genuine issues of material fact preclude summary

judgment as to plaintiff's Title IX retaliation claim.[12]

### 2. Plaintiff's Section 1983 Claims

#### a. Section 1983 Claims Against Hanover Area

Defendants also move for summary judgment on the Section 1983 claims

lodged against Defendants Hanover Area, Barrett, and Pugh.   As previously

noted, this matter involves alleged violations of the Equal Protection Clause.

Plaintiff previously advanced two different theories of liability against Hanover

Area in this matter, disparate treatment and hostile educational environment.

L.S., 2024 WL 2393038, at *20.  However, in opposing summary judgment,

plaintiff did not squarely address arguments that judgment should be granted in

defendants' favor on the disparate treatment theory of liability.  (Doc. 73, Pl. Br.

---

[12] As for Hanover Area's arguments in this section of their brief that D.S. was "just under 4 years old and enrolled in a non-compulsory preschool program; and that the two class options are both age-appropriate ***preschool*** programs[,]" (Doc. 70-2 at 24), this does not preclude a finding that adverse action occurred.  As discussed in the prior memorandum, Hanover Area offered prekindergarten pursuant to federal and state funding programs tied to the income levels of the families in the district.  While prekindergarten is non-compulsory, Hanover Area offered prekindergarten presumably for no other reason but to improve school outcomes for its students, including D.S.  If a jury credits L.S.'s version of the facts, they may reasonably conclude that Hanover Area's conduct toward D.S. was in retaliation for L.S. complaints about a sexual assault occurring.

Along those same lines, Hanover Area argues that its administrators did not act with retaliatory intent. (Doc. 70-2 at 24).  However, a jury finding truth in L.S.'s account may reasonably question Pre-K Director Pugh's explanations about why she moved one male student, but not the other based on the court's review of the record. (Doc. 74-10, Def. Resp. to Interrog., at ECF p. 4; Doc. 74-18, J. Ramagli Dep. 6:13-16).

in Opp. at 48–50). Instead, plaintiff signals that she wishes to proceed only on a hostile educational environment theory of liability. Id. The court will thus grant partial summary judgment in favor of Hanover Area to the extent that plaintiff alleged a Section 1983 disparate treatment claim. The court will proceed to only address the hostile educational environment claim.

To establish a hostile environment equal protection claim, a plaintiff must "prove all the elements of her Title IX claim and that the harassment was the result of municipal custom, policy, or practice." Goodwin v. Pennridge Sch. Dist., 389 F. Supp. 3d 304, 319–20 (E.D. Pa. 2019) (citing Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257–58 (2009); Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694 (1978)). The policy or custom must also be the proximate cause of her injuries. Id. (citation omitted).

Here, for the reasons discussed above, the evidentiary record precludes summary judgment on the Title IX claims. L.S. has also supplied evidence in opposition to summary judgment that duly authorized district decision-makers failed to recognize, investigate, and respond to a report of sexual assault and/or decided on an *ad hoc* basis not to enforce existing policies, such as the district's Title IX policy.

Defendants repeat their arguments that Superintendent Barrett and Pre-K Director Pugh did not have final policymaking authority in their roles with Hanover

Area.  The court previously reviewed the law based on the allegations in the

pleadings.  L.S., 2024 WL 2393038 at *16–19.  The court also previously

reviewed relevant Hanover Area policies about prekindergarten education and

classroom placement, which expressly delegated authority to the superintendent

or a designee.  Id.  With the record provided, particularly Barrett and Pugh's

deposition testimony, the court need not adjust that prior analysis.  Genuine

issues of material fact preclude summary judgment.

　　　*Failure to Train* – Plaintiff also advances a failure to train theory of

municipal liability against Hanover Area.  The court previously addressed

Hanover Area's legal arguments against L.S.'s allegations and determined that a

claim based on a single incident could proceed under the facts alleged in the

pleadings.  L.S., 2024 WL 2393038 at *22–23.  Specifically, the earlier

memorandum noted that:

> A single-incident-based failure to train claim against a
> school district survives a motion to dismiss where a plaintiff
> alleges that a school enacted a policy conveying its
> awareness of the consequences of not following the policy,
> failed to train employees on that policy, and a child
> sustained a constitutional injury from that failure to train.

Id. at *23 (citing L.R. v. Sch. Dist. of Philadelphia, 60 F. Supp. 3d 584, 599–601
(E.D. Pa. 2014), aff'd, 836 F.3d 235 (3d Cir. 2016)).

　　　Since that time, the Third Circuit Court of Appeals has reiterated that

single-incident failure-to-train claims are "vanishingly rare" and may proceed in

only "unusual" and "extreme" cases. <u>Miller v. City of Philadelphia</u>, 162 F.4th 88, 94 (3d Cir. 2025) (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 390, n.10 (1989); <u>Connick v. Thompson</u>, 563 U.S. 51, 63–64 (2011); <u>Hightower v. City of Philadelphia</u>, 130 F.4th 352, 357 (3d Cir. 2025)).  It has emphasized that the United States Supreme Court has never found this bar satisfied and that the hypothetical example offered in <u>Canton</u> involved life-or-death consequences from a failure to train—"if a city armed its police with guns and set them loose without any legal training on when to use them." <u>Hightower</u>, 130 F.4th at 357.

Sexual assaults in schools involve life-or-death consequences.  Title IX was enacted in 1972.  <u>Davis</u> was decided in 1999.  The Department of Education issued the applicable Title IX regulations before the 2020-2021 school year.  Based on the promulgation of the 2020 regulations, the Hanover Area school board issued a revised, comprehensive Title IX policy in March 2021, which named a Compliance Officer and Title IX coordinator, Karen McHale. (See Doc. 74-8, Hanover Area School District Policy § 103 "Discrimination/Title IX Sexual Harassment Affecting Students" at ECF pp. 1–42).  This incident occurred several months into the 2021-2022 school year.

Defendant Ramagli, D.S.'s teacher, had no knowledge of Title IX, other than it having to do with gender. (Doc. 74-1, J. Ramagli Dep. 56:21–60:16).  She

could not identify the district's Title IX coordinator at the time of her deposition, approximately 18 months after the incident. Id.  She testified:

> Q.    Whatever training you've had at that school district was not enough to inform you who to report Title [IX] issues to?
>
> A.    I'm not exactly sure what Title [IX] is, so I don't know.

Id.

Superintendent Barrett testified that L.S.'s allegations of sexual assault did not raise any Title IX concerns because the report was coming from L.S. and not the Victim's Resource Center.[13] (Doc. 74-14, N. Barrett Dep. 92:25–93:17, 102:25–103:6).  Furthermore, Barrett was unsure whether Title IX applied to sexual assaults. Id., 98:3-19.  He testified that the district's Title IX policy was on its website, but there was no requirement for school employees to read it. Id., 98:19-25.  Pre-K Director Pugh answered, "I don't recall," to several questions related to Title IX training during her deposition and "not to my knowledge," with

---

[13] Barrett also testified as follows:

> **Q.** Assuming those boys were putting mulch in [D.S.'s] behind, can we agree that that incident was sexual in nature?
>
> **[Defense Counsel]:** Objection.
>
> **[Barrett]:** Yes, that would be.

(Doc. 74-14, 104:14-18).

respect to reporting the incident regarding D.S. to the district's Title IX
coordinator.  (Doc. 74-17, 80:11–83:20).

Through litigation, plaintiff has identified serious deficiencies in the working
knowledge of Hanover Area's staff and administrators with respect to Title IX.
Nonetheless, summary judgment must be granted in favor of Hanover Area on
the failure-to-train claim advanced in this case.

To succeed on a Section 1983 failure-to-train claim, a plaintiff must
demonstrate that the training deficiency actually caused the injury. Reitz v. Cnty.
of Bucks, 125 F.3d 139, 145 (3d Cir. 1997) (citing Canton, 489 U.S. at 391).

In opposition to summary judgment, L.S. has not demonstrated how D.S.'s
outcome would have been different if Williams, Schlauch, Farrell, Ramagli, Pugh,
or even Barrett were fully versed in Title IX, its attendant regulations, and the
district's Title IX policies.  In short, Ramagli, Pugh, and Barrett did not believe
L.S.'s account of the events on the playground.  Plaintiff has come forward with
no evidence that the district's Title IX coordinator/investigator would have.
Furthermore, Barrett supported Pugh's view of the remedies to be offered in
D.S.'s case since she was the Pre-K Director. Plaintiff has no evidence that the
"corrective action" would have been different had the Title IX coordinator been
involved.  Moreover, if teachers, staff, and administrators followed the Title IX
policies in place at the district, Barrett would have heard any appeals if L.S. was

33

unsatisfied about any formal Title IX outcomes. (Doc. 74-8, ECF p. 24; Doc. 74-14, N. Barrett Dep. 49:24–50:11).  Therefore, within a Title IX structure or not, Barrett's decision would have been the same based on a review of his testimony. Consequently, based on a failure to come forward with evidence on causation, summary judgment will be granted in Hanover Area's favor on plaintiff's Section 1983 failure-to-train claim.[14]

### b. Section 1983 Claims Against Superintendent Barrett and Pre-K Director Pugh

Defendants again assert that Defendants Barrett and Pugh enjoy qualified immunity from the Section 1983 claims asserted against them.[15]  Based on the summary judgment record, the court will fully revisit its prior analysis.

"There is a well-settled two-part test to determine whether government officials should receive qualified immunity." Montemuro v. Jim Thorpe Area Sch. Dist., 99 F.4th 639, 642 (3d Cir. 2024) (citing Anglemeyer v. Ammons, 92 F.4th 184, 188 (3d Cir. 2024); Pearson v. Callahan, 555 U.S. 223, 236 (2009)).  To overcome the qualified immunity defense, a plaintiff must show two things: 1) that the official violated a statutory or constitutional right; and 2) that the right was

---

[14] The court reiterates that the Title IX claims and the Section 1983 hostile educational environment claim against Hanover Area will proceed to trial.

[15] A school district is not eligible for qualified immunity.  See Montemuro v. Jim Thorpe Area Sch. Dist., 99 F.4th 639, 642 (3d Cir. 2024) (citation omitted).

clearly established at the time of the challenged conduct.  Harlow v. Fitzgerald,
457 U.S. 800, 818 (1982).

Although L.S. has enough evidence to go to a jury on violations of the
equal protection clause through a hostile educational environment theory, she
must overcome the "clearly established" prong of the qualified immunity analysis
with respect to her claims against Barrett and Pugh.  That is, "a government
official's conduct violates clearly established law when, at the time of the
challenged conduct, the contours of a right are sufficiently clear that every
reasonable official would have understood that what he is doing violates that
right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  Existing case law, "must
give the official 'fair warning' that his conduct is unconstitutional." Stringer v.
Cnty. of Bucks, 141 F.4th 76, 85 (3d Cir. 2025) (citing Hope v. Pelzer, 536 U.S.
730, 741 (2002)).

Under the law, the court must "first define the right specifically, based on
the particular facts[,]" then "figure out if a reasonable [government official] would
have been on notice that his conduct would violate that right." Otero v. Kane, 161
F.4th 189, 194 (3d Cir. 2025) (citations omitted).  "Typically, analogous precedent
from the Supreme Court or [the Third Circuit] or a consensus of persuasive
authority in the Courts of Appeals is required." Stringer, 141 F.4th at 85 (citing
Clark v. Coupe, 55 F.4th 167, 182 (3d Cir. 2022); Peroza-Benitez v. Smith, 994

F.3d 157, 165 (3d Cir. 2021)).  Analogous means factually analogous. <u>Clark</u>, 55 F.4th at 181.  This does not mean "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." <u>al-Kidd</u>, 563 U.S. at 741.

The court previously defined D.S.'s Equal Protection right as "the right to be free from the deliberate indifference of school officials to reports of student-on-student sexual harassment/sexual assault." <u>L.S.</u>, 2024 WL 2393038, at *22.  This articulation was too abstract. <u>See</u> <u>Urda v. Sokso</u>, 146 F.4th 311, 314–15 (3d Cir. 2025) (citing <u>Anderson v. Creighton</u>, 483 U.S. 635, 639–41 (1987); <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004) (per curiam); <u>al-Kidd</u>, 563 U.S. at 742; <u>Mullenix v. Luna</u>, 577 U.S. 7, 12 (2015) (per curiam); <u>White v. Pauly</u>, 580 U.S. 73, 79 (2017) (per curiam); <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 64 (2018); <u>City of Escondido v. Emmons</u>, 586 U.S. 38, 42–43 (2019) (per curiam); <u>Rivas-Villegas v. Cortesluna</u>, 595 U.S. 1, 5–6 (2021) (per curiam)).

Rather, to overcome qualified immunity, it must be clear to a reasonable official that their conduct was unlawful in the situation they confronted.  <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001), <u>overruled on other grounds by</u> <u>Pearson</u>, 555 U.S. at 236.  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.' " <u>Mullenix</u>, 577 U.S. at 12 (quoting <u>al-Kidd</u>, 563 U.S. at 742 and adding emphasis).  Put another way, "existing law

must clearly establish that what *this* [school official] did in *these* circumstances violated the plaintiff's rights." Urda, 146 F.4th at 314 (emphasis added).

Thus, as emphasized by these cases, the court must add a descriptor about Superintendent Barrett and Pre-K Director Pugh's conduct and better define the situation they confronted. With this adjustment, the question presented here is whether preexisting law clearly established that a school administrator violates a female prekindergartner's right to equal protection of the laws when they refuse a parent request to remove two male students from her classroom after the parent complained that those students sexually assaulted her daughter.

There are no materially similar cases previously decided by the Third Circuit. In the absence of controlling precedent, the court previously found a "robust consensus of persuasive authority" from the other Courts of Appeals. L.S., 2024 WL 2393038, at *22 (citing Feminist Majority Found. v. Hurley, 911 F.3d 674, 702 (4th Cir. 2018); Stiles ex rel. D.S. v. Grainger Cty., 819 F.3d 834, 851–52 (6th Cir. 2016); Nabozny v. Podlesny, 92 F.3d 446 (7th Cir. 1996); Flores v. Morgan Hill Unified Sch. Dist., 324 F.3d 1130 (9th Cir. 2003); Murrell v. Sch. Dist. No. 1, Denver, 186 F.3d 1238, 1250 (10th Cir. 1999); Hill v. Cundiff, 797 F.3d 948, 978 (11th Cir. 2015)). Upon re-review, these cases form a patchwork to support a more broadly defined legal right—"a victim of student-on-student

sexual harassment can pursue an equal protection claim predicated on a school administrator's deliberate indifference to such harassment." <u>Feminist Majority Foundation</u>, 911 F.3d at 702.  But these out-of-circuit decisions do not form a robust consensus regarding allegations of sexual assault lobbied by the mother of a female prekindergartner against male prekindergartners.[16]  Consequently, when using a more granular definition as required, Superintendent Barrett and Pre-K Director Pugh enjoy qualified immunity from the Section 1983 claims asserted against them in this matter.  Summary judgment will be granted in their favor.

### 3. Plaintiff's Negligence Claims

L.S. also brings state law negligence claims against Hanover Area and the prekindergarten teachers supervising the playground, Defendants Ramagli and Farrell.  These defendants renew their arguments that they are immune under the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA").  Additionally, Defendants Ramagli and Farrell re-raise the argument that they enjoy common

---

[16] <u>Stiles</u> involved middle school bullying.  819 F.3d at 840–46.  <u>Murrell</u> involved special education students and high school staff members who allegedly actively participated in the concealment of sexual assault. 186 F.3d at 1243–44.  <u>Feminist Majority Foundation</u> involved a university president's response to social media harassment.  911 F.3d at 680–85.  <u>Nabozny</u> and <u>Flores</u> involved sexual orientation harassment and discrimination.  <u>Flores</u>, 324 F.3d at 1137–38 (discussing <u>Nabozny</u>).  <u>Hill</u> involved a situation where school officials decided to use a female middle school student in a sting operation to catch a male student in the act of sexual harassment and the male student raped the female student.  797 F.3d at 955–56.

law public official immunity.  Ramagli and Farrell also challenge L.S.'s evidence of the negligence.

First, Hanover Area renews its arguments that "immunity is eliminated only when the alleged sexual abuse is committed by an employee of the local agency." (Doc. 70-2, Def. Br. in Supp. at 35).  As predicted by the court before and again now, the sexual abuse exception to governmental immunity, 42 PA. CONS. STAT. § 8542(b)(9) ("Section 8542(b)(9)"), does not limit the exception only to sexual abuse committed by local agency employees. L.S., 2024 WL 2393038 at *11–13 (discussing 42 PA. CONS. STAT. §§ 8541, 8542 (a)–(b), (b)(9)).

State jurisprudence now lines up with the court's previous analysis. [17] Specifically, the Commonwealth Court of Pennsylvania has described the court's previous forecasting about Section 8542(b)(9) to be a "reasonable, albeit imperfect interpretation[]" of the statute.  L.F.V. by Varano v. S. Philadelphia High Sch., 340 A.3d 395, 409 and n.28 (Pa. Commw. Ct. 2025) (discussing L.S., 2024 WL 2393038, at *13), appeal granted, No. 243 EAL 2025, 2025 WL 3456607 (Pa.

---

[17] The specific issue involved in this case has not been addressed by the Supreme Court of Pennsylvania.  Where no reported decision of the Pennsylvania Supreme Court exists, it is the duty of a district court judge to predict how the Pennsylvania Supreme Court would interpret relevant provisions of the PSTCA if presented with this case. Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir. 2000).  In making that prediction, the decisions of intermediate Pennsylvania appellate courts receive significant weight in the absence of an indication that the highest state court would rule otherwise. See SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 204 (3d Cir. 2022) (citations and quotation marks omitted).

Dec. 2, 2025).  Despite that tempering, the Commonwealth Court relied on legislative history and this court's prior memorandum to conclude that Section 8542(b)(9)'s waiver of immunity encompasses situations where third parties commit sexual abuse, not just employees of the local agency.  Id. at 399, 405–11.  The undersigned predicts that the Supreme Court of Pennsylvania will similarly interpret the sexual abuse exception to the PSTCA.  Thus, if L.S.'s account of the events on the playground is believed by a jury, Hanover Area is not immune from the negligence claim.

Second, Defendants Ramagli and Farrell continue to assert that they enjoy PSTCA immunity and "common law public official immunity."  For the reasons previously asserted, the court rejects those arguments.  L.S., 2024 WL 2393038, at *15.  The evidentiary record requires no change in the analysis.  The Supreme Court of Pennsylvania's recent decision in Winig v. Off. of Dist. Att'y of Philadelphia, 347 A.3d 2, 11–12 (Pa. 2025) also does not alter the analysis.

Finally, Defendants Ramagli and Farrell argue that plaintiff has not come forward with evidence demonstrating that they were negligent.  Viewing the summary judgment record in a light most favorable to the plaintiff as the non-moving party, there is a clear path for a jury to find that Ramagli and Farrell breached their duties to D.S. on the playground, which caused D.S. to sustain an injury.  Arguments advanced by defendants about the facts with respect to

negligent supervision are better suited for a jury. Accordingly, the negligence claims against Hanover Area, Ramagli, and Farrell will proceed to trial where those arguments can be made.

**Conclusion**

For the reasons set forth above, defendants' motion for summary judgment will be granted in part and denied in part. The motion will be granted as to the Section 1983 claims against Hanover Area premised on disparate treatment as a violation of the Equal Protection Clause, but not on the portion of the claim premised on a hostile educational environment theory of liability. The motion will be granted as to the Section 1983 claim against Hanover Area premised on a failure-to-train. Furthermore, the motion will also be granted as to the Section 1983 claims against Nathan Barrett and Daphne Pugh because of their qualified immunity.

Defendants' motion for summary judgment will otherwise be denied. An appropriate order follows.

Date: 1/30/26

JUDGE JULIA K. MUNLEY
United States District Court

41